COMMONWEALTH *vs*. FLORENCIO MENDEZ. No. 08-P-1069. July 2, 2010. *Evidence*, First complaint, Hearsay, Cross-examination, Impeachment of credibility. *Practice, Criminal*, Jury and jurors. *Jury and Jurors. Child Abuse.*

In October, 2007, after the Supreme Judicial Court's adoption of the first complaint doctrine in *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006), but prior to further elaboration of the doctrine in cases such as *Commonwealth* v. *Stuckich*, 450 Mass. 449 (2008), and *Commonwealth* v. *Arana*, 453 Mass. 214 (2009), the defendant was tried and convicted on indictments charging that, in 2002, he sexually assaulted his wife's nieces — Alice, then ten years old, and Betty, then fourteen years old[1] — when they spent successive nights at his house assisting with child care.[2] The defendant's primary claim on appeal is that multiple complaint testimony was received during the Commonwealth's case, in violation of the first complaint doctrine. Because the defendant did not object below, we must decide whether the testimony was properly admitted and, if not, whether it created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Kebreau*, 454 Mass. 287, 297 (2009). *Commonwealth* v. *McCoy*, 456 Mass. 838, 845-846, 850 (2010).

At trial, the victims' mother testified as the Commonwealth's designated first complaint witness with respect to Alice; however, the Commonwealth offered no first complaint witness as to Betty. The defendant now claims that the following additional complaint evidence was admitted erroneously: (1) the testimony of the victims' mother concerning Betty's appearance and behavior immediately after returning from the defendant's house; (2) the testimony of the investigating police officer about her interviews of the victims and the actions that she took in response; and (3) the testimony of Betty that, upon

---

[1]The victims' names are pseudonyms.

[2]The defendant's wife had been involved in an accident and needed help minding her two young children.

returning home, she spoke with her mother and older sister about what had happened at the defendant's house.

1. The mother's testimony concerning Betty's demeanor was "neither inadmissible hearsay nor first complaint evidence," and was properly admitted. *Id.* at 846.

2. As to the police officer's testimony, there was no substantial risk of a miscarriage of justice. From the outset, the defendant's strategy was to attack the victims' credibility by showing that their original accounts to the police investigator differed from the accounts the jury would hear at trial. In fact, the defendant had the officer under summons and required her presence at the trial. Compare *id.* at 851. In particular, the defendant sought to exploit a discrepancy as to which victim was the first to spend the night at the defendant's house. The defendant contended that if, as the victims originally told the investigator, it was Betty who went there first, the victims' complaints were totally improbable — because ten year old Alice would have been sent over *after* Betty had returned upset and crying that she had been sexually assaulted.[3] On this basis, defense counsel developed the theme that the victims had fabricated an implausible story, that they later changed it in an attempt to make it more credible, and that they simply should not be believed. Prior to the officer's testimony, the defendant had already used the officer's report in cross-examining Alice and Betty, to impeach their testimony as to which one of them first stayed overnight at the defendant's home. The impeachment of their testimony continued with the defendant's cross-examination of the officer. See *id.* at 852 ("Importantly, on cross-examination, defense counsel immediately questioned [the detective] about details of the interview [with the victim], drawing out inconsistencies between the victim's testimony and her statements during the interview. Thus, any error in allowing the testimony of [the detective] was overcome by the benefits received in cross-examination, and the error in admitting this testimony did not prejudice the defendant's case").

3. As to Betty's testimony, defense counsel "opened the door" in opening argument, when he referred to descriptions of Betty's behavior upon returning home from the defendant's house, i.e., how she made "a big deal out of it, yelling and screaming her complaint" in the presence of other members of the family. That said, the process leading to the admission of Betty's testimony about her conversations with her mother and sister bears further discussion. This testimony was elicited not by the prosecutor but, rather, as a result of questions submitted by the jury, under the practice permitted by *Commonwealth* v. *Britto*, 433 Mass. 596, 613-615 (2001). While the prosecutor did not formally object to the proposed questions, she voiced concern about violation of the first complaint rule, because Betty's conversations with her mother and sister had taken place after Betty already had telephoned her boyfriend to report the assault. Nevertheless, after some back and forth, and with the agreement of defense counsel, the judge decided that Betty could be asked whether she conversed with her mother and sister about what happened after she returned home — as long as the content of those conversations was not mentioned.

---

[3]At trial, the Commonwealth's witnesses testified that Alice was the first to go to the defendant's house and that she did not tell anyone about the defendant's attack upon her until three years later, when she disclosed it to her mother.

The judge explained his ruling by stating, "[T]hat's the only fair way to avoid what I think is going to be a misunderstanding of the evidence that could result in an improper inference being drawn adverse to the Commonwealth by the jury," that is, the inference that Betty did not promptly complain when she would have been expected to do so.

The problem with this rationale, however, is that where the Commonwealth, for whatever reason, was not introducing the testimony of the known first complaint witness and was not seeking to offer a substitute, evidence of Betty's disclosure to two other witnesses could not be used for the first complaint purpose of showing that she had not remained silent. See generally *Commonwealth* v. *King*, 445 Mass. at 243-247. We mention this not to quibble with the judge's ruling, which, as we have discussed, was correct for a different reason, but to again take the opportunity to point out, as we did in *Commonwealth* v. *Reeder*, 73 Mass. App. Ct. 750, 756-757 (2009), that permitting jurors to submit questions in criminal cases is not without risk. Suffice it to say that in criminal cases involving subtle evidentiary issues like first complaint, judges should be particularly cautious in exercising discretion to permit jurors to submit questions and, if they are so permitted, in exercising discretion to pose particular questions.

In any case, we think that satisfying the jury's desire for more information ordinarily should not trump a party's deliberate choice as to how most effectively to present its case while avoiding the possibility of error. If, for example, a cautious prosecutor has decided to forgo a line of inquiry that would be helpful to the Commonwealth, the more prudent course is not to permit the jury to venture where the prosecutor has feared to tread.[4]

*Judgments affirmed.*

*Sean J. Gallagher* for the defendant.
*Jane A. Sullivan*, Assistant District Attorney, for the Commonwealth.


---

[4]We have considered the defendant's remaining contentions concerning the impartiality of the judge, the jurors' alleged "rush to judgment," and the judge's comments at sentencing. Substantially for the reasons stated in the Commonwealth's brief, they are without merit and require no discussion.