## COMMONWEALTH *vs.* MANUEL VELAZQUEZ.

No. 08-P-1042.

Hampden. October 7, 2010. - January 26, 2011.

Present: LENK, SMITH, & MILKEY, JJ.

*Rape. Evidence,* First complaint, Expert opinion. *Witness,* Expert.

This court concluded that a new trial was necessary with regard to indictments
charging the defendant with forcible rape of a child, where the testimony
of a pediatrician who had examined the complainant, and who was not the
designated first complaint witness, effectively communicated to the jury
her belief in the complainant's allegations, and the potential prejudice
caused by the pediatrician's implicit vouching for the complainant was
significantly amplified by the fact that the pediatrician was called to testify
as an expert witness; where other, unpreserved errors, while not of great
import, were not trivial; and where defense counsel's unpreparedness to
engage the pediatrician as an expert witness precluded this court from
concluding that the jury could find their way and that the defendant was
well defended and fairly tried. [665-670]

INDICTMENTS found and returned in the Superior Court Department on November 2, 2004.

The cases were tried before *C. Jeffrey Kinder,* J., and a motion for a new trial, filed on October 3, 2008, was heard by him.

*Iris Alkalay* for the defendant.

*Thomas H. Townsend,* Assistant District Attorney, for the Commonwealth.

MILKEY, J. After a jury trial in Superior Court, the defendant was convicted of four counts of forcible rape of a child (G. L. c. 265, § 22A). The Commonwealth concedes that there were several violations of the first complaint doctrine at trial. The defendant objected to some of the errors but not to others. The question we face is whether the combination of preserved and

unpreserved errors requires a new trial. We conclude that it does.[1]

*Background.* The defendant is the father of the young girl who alleges that she was raped. We will refer to her as Becka.[2] Becka's parents had separated, and during the relevant period, she lived principally with her mother, her mother's boyfriend (Elvin), and her two sisters. The defendant lived with his sister's family, and Becka visited the defendant and her paternal relatives at her aunt's house on weekends, two to three times per month. Becka's sisters, who have a different biological father, did not accompany her on those visits.

Becka testified that when she was eight, the defendant began anally raping her at her aunt's house, and that he continued to do this over several months' worth of visits. According to Becka, the rapes occurred either at night while the others in the household were sleeping, or during the day when they were not home. While her testimony was brief, Becka provided some detail about the alleged acts, and she demonstrated to the jury, away from the witness stand, how her body was positioned while the acts occurred.

At the end of this graphic testimony, the prosecutor asked Becka if the man who raped her was in the courtroom. To the prosecutor's evident surprise, Becka answered, "No." The prosecutor then asked: "You don't see your dad in the courtroom today?" Becka again answered, "No." The prosecutor pressed her once more: "Your dad is not sitting over there in the courtroom?" At this point, Becka did identify her father, and the prosecutor prompted her to agree that he looked different because he did not "used to have glasses and a beard like that."

Defense counsel conducted only a limited cross-examination of Becka. Counsel elicited from her that while Becka referred to the defendant by his nickname, "Manico," she and her sisters called her mother's boyfriend Elvin "Dad." Becka also acknowledged that Elvin moved out "not very long after this happened."

The Commonwealth called four additional witnesses, all of whom testified to events that occurred after the alleged incidents.

---

[1] The defendant also challenges the denial of his motion for a new trial that he based on a claim of ineffective assistance of trial counsel.

[2] A pseudonym.

The witness who immediately followed Becka was her older sister, Selena,[3] who was Becka's close confidante and "secret keeper." Selena recounted a series of conversations that took place in March of 2004, while the mother, Becka, and Selena were traveling to school in the family minivan.[4] According to Selena, Becka became extremely upset when their mother unexpectedly announced that Becka was to spend the upcoming weekend with the defendant. In response to questions from her mother and from Selena as to why she was so upset, Becka initially declined to explain why. After Selena continued to press, Becka, "whispering" into Selena's ear, told Selena that the defendant had raped her. While they were all still in the minivan, Selena eventually repeated Becka's allegations to their mother, and the mother was drawn into what was (at least in part) a three-way conversation.

After Selena testified, the mother gave her own account of the minivan conversations, over the defendant's objection that the mother could not serve as a "second first complaint witness." The two accounts were consistent, with Selena and the mother each providing some detail absent from the other's telling. The mother also testified about events that occurred in the aftermath of Becka's having revealed her allegations: that the mother repeated these allegations to Becka's great-grandmother, that the mother also passed them along to the State agency then known as the Department of Social Services (DSS),[5] and that DSS directed Becka to come to the hospital.

The next witness was Dr. Nancy Miller, a pediatrician at the Family Advocacy Center at Baystate Children's Hospital. At the start of her testimony, Dr. Miller described the Family Advocacy Center as "a child advocacy center where we work with children and families who have been affected by child abuse and/or domestic violence." She explained the various ways that children are referred to the center, and she noted that she personally had examined "[s]everal thousand" children there. In response to the prosecutor's question why it was important for children to

---

[3]Also a pseudonym.

[4]Without objection, Becka herself testified about the conversation before Selena took the stand.

[5]Now known as the Department of Children and Families.

be examined at the Family Advocacy Center rather than at an emergency room, she responded without objection: "[W]e are experts in what we are doing."

Dr. Miller testified that she had met with Becka on April 26, 2004, a few weeks after Becka had reported the allegations to her sister and her mother. When Dr. Miller began to testify about what Becka had told her and shown her using anatomically correct dolls, the defendant objected. After the judge overruled the objection, Dr. Miller testified that Becka was able to demonstrate with the dolls "what happened to her." Dr. Miller then testified that she proceeded to conduct a physical examination of Becka during which she observed no signs of trauma, such as "tearing, redness, [or] bruising," in the relevant anatomical areas. Immediately thereafter, the prosecutor asked, "[D]id that surprise you?" Dr. Miller replied, "No," and when she started to respond to the prosecutor's follow-up question, "Why not?" the defendant objected again. At sidebar, defense counsel stated that the objection was based on the ground that the questioning was beginning to call for expert testimony and Dr. Miller had not been qualified as an expert. Defense counsel added that, regardless of whether Dr. Miller might qualify as an expert, the Commonwealth had not notified the defendant that it intended to call her as one and had not complied with the discovery rules regarding expert witnesses.

After counsel debated these issues at length, the judge rejected all of the defendant's arguments and allowed Dr. Miller to testify freely as an expert witness. She proceeded to recount in detail why she was not surprised to observe that Becka did not show any signs of physical abuse, supporting her views with references to unspecified scientific studies. As but one example, she testified, without further objection, that "most of the time, eighty-five percent or more of the time, when we look at scientific studies of children who have been sexually abused, they will have normal examinations, that is, due to the nature of the alleged acts and the physiology of the issue involved."

Defense counsel undertook only a brief cross-examination of Dr. Miller, totaling less than six pages of transcript. Counsel did not challenge Dr. Miller's credentials or conclusions and largely focused on getting clarification that Dr. Miller was not asserting

that she had observed physical signs that positively demonstrated a sexual assault but only that the absence of such signs did not rule it out.[6]

On redirect, the prosecutor returned to the subject of what Becka had communicated to Dr. Miller. In response to the prosecutor's questions, Dr. Miller repeatedly stated that when Becka had described what had happened to her, she was speaking about the defendant and not Elvin (even though it was Elvin whom Becka called "Dad").

The Commonwealth's final witness was a social worker at DSS. On direct examination, she testified about the investigatory practices that DSS used both in general and in this case. Although she stated that she had interviewed Becka as part of this process, the social worker did not repeat the substance of those conversations. On cross-examination, defense counsel elicited from her that, when Becka had been asked whether she knew the difference between a truth and a lie, she had answered, "No." The social worker also acknowledged that at the time of the alleged incidents, the mother had an open and "supported" case file at DSS for physical abuse and neglect, and that Elvin "apparently" did as well. On redirect, the social worker explained that she had asked Becka a series of follow-up questions designed to determine that she could discern the difference between the truth and a lie, and the social worker indicated that Becka could do so. The social worker also stated that she had not investigated Elvin for any sex-related allegations.

After the Commonwealth rested, the defendant called only one witness, his niece (Becka's cousin), who lived in the house where and when the rapes allegedly occurred. The main subject of her testimony was the sleeping arrangements in the house. She testified on direct examination that when Becka stayed at the house, Becka slept with her in her bedroom, while the defendant slept in the living room. On cross-examination, however, the

---

[6]On direct examination, Dr. Miller had stated that after the examination, she followed up with the mother to report that "the physical examination was normal, that we thought that it was consistent with what the child was saying." On cross-examination, the defendant prompted Dr. Miller to acknowledge that when she used the term "consistent," she really meant that "it doesn't rule [the alleged rapes] out as a possibility."

niece abandoned that position and acknowledged that the defendant sometimes slept in the bedroom with Becka.

*Discussion.* Selena testified as the Commonwealth's designated first complaint witness. See *Commonwealth* v. *King,* 445 Mass. 217, 242-245 (2005). The defendant raises no claims of error about Selena's testimony but challenges instead the additional complaint testimony that came in through the mother, Dr. Miller, and the DSS social worker. Of the seven individual violations of the first complaint doctrine that the defendant alleges, the Commonwealth concedes that five of them were error, and it does not contend that any of this complaint testimony could have been admitted on alternative grounds. See *Commonwealth* v. *Arana,* 453 Mass. 214, 229 (2009); *Commonwealth* v. *Monteiro,* 75 Mass. App. Ct. 489, 494-495 (2009). The Commonwealth nevertheless argues that the various violations do not amount to reversible error, because "they did not prejudice the defendant (for those [errors] preserved) or give rise to a substantial risk of a miscarriage of justice (for the unpreserved)."

We agree with the Commonwealth that many of the errors, including some of the ones the defendant has chosen to highlight, are of little moment (at least when they are viewed individually). For example, the mother's separate account of the minivan conversation ultimately added minimal, if any, force to the Commonwealth's case regardless of whether it should have been admitted.[7] In addition, the mother's testimony that she repeated Becka's allegations to her great-grandmother is more notable for its irrelevancy than its prejudicial effect.[8]

---

[7]The Commonwealth does not concede that the mother's testimony about the minivan conversation was a first complaint violation. Instead, it asserts that where Selena and the mother were told Becka's allegations so closely in time (and space), that they effectively both were witnesses to Becka's first complaint. Compare *Commonwealth* v. *Revells, ante* 492, 496 (2010) (finding no first complaint violation from the introduction of both written and oral communications, where "the victim's first complaint to her mother consisted of a single, tightly intertwined oral and written communication"). However, even under the Commonwealth's view that there were two witnesses to the first complaint, there would still need to be a legitimate purpose served by having both witnesses testify. In any event, because we conclude that any prejudice effected by this part of the mother's testimony was minimal at best, and that reversal is warranted on other grounds, we need not resolve whether the mother's testimony about the minivan conversations constituted a first complaint violation.

[8]The parties both treated this as a first complaint issue even though it went

However, other errors are more serious. Of particular concern is the testimony of Dr. Miller about what Becka had told and showed her. As the Commonwealth now concedes, it was error to admit Dr. Miller's testimony about this, and the defendant raised a timely objection. Therefore, we can affirm only if we are convinced "that the error did not influence the jury, or had but very slight effect." *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983). For the reasons that follow, we cannot reach that conclusion.

As is generally true in prosecutions of this sort, the Commonwealth's case ultimately rested on the credibility of a single eyewitness.[9] See *Commonwealth* v. *Mendrala*, 20 Mass. App. Ct. 398, 402 (1985), quoting from *Commonwealth* v. *Gardner*, 350 Mass. 664, 667 (1966) ("As is often the case where there are charges of rape or sexual assault, the question of guilt or innocence rests in large part 'upon whether the jury believed the victim's version of what happened or the defendant['s]' "). In this context, allowing multiple witnesses to testify that an alleged victim relayed her allegations to them by itself creates potential prejudice. See *Commonwealth* v. *Stuckich*, 450 Mass. 449, 457 (2008) ("Repetition of the narrative tends to enhance the credibility of the complainant to the prejudice of the defendant"). See also *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. at 497 ("In a case such as this one, which turned on credibility, there is a particularly high probability of prejudice from the admission of duplicative complaint evidence").

Here, the Commonwealth did more than merely elicit that Becka had repeated her allegations to multiple parties. Most importantly, although Dr. Miller never specifically was asked whether she believed Becka, her testimony effectively communicated to the jury that she did. As noted, *supra*, Dr. Miller was allowed to testify that Becka was able to demonstrate with the dolls "what happened to her." Moreover, directly thereafter,

---

to the mother's passing along what Becka had told her to a third party, not Becka herself repeating the allegations. Some of the other alleged errors also were not strictly first complaint issues, even though the parties characterized them as such.

[9]This observation goes to the nature of the Commonwealth's case, not its strength.

the prosecutor pointedly asked Dr. Miller whether the absence of physical trauma "surprise[d]" her. Dr. Miller's answering, "No," and her explanation of why she was not surprised by the absence of physical trauma necessarily conveyed that she believed Becka's allegations to be true.

The potential prejudice caused by Dr. Miller's implicitly vouching for Becka's allegations was significantly amplified by the fact that Dr. Miller was called to testify as an expert witness.[10] See *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 872 (2001), quoting from *Commonwealth* v. *Richardson*, 423 Mass. 180, 186 (1996) ("The danger of vouching 'is greater where the witness is testifying as both a direct witness and an expert, particularly where the witness offers fresh complaint testimony' "). This court, and the Supreme Judicial Court, long and frequently have cautioned about the potential dangers of using the same witness as both an expert and a percipient witness in criminal cases, especially in sexual assault cases. See, e.g., *Commonwealth* v. *McCaffrey*, 36 Mass. App. Ct. 583, 590-594 (1994), and cases cited.[11] As we said in *McCaffrey*, *id.* at 591, "[t]here appears to be particular risk of undue influence when

[10]We emphasize that "it is well within the province of a medical expert witness to explain that an absence of physical findings does not necessarily indicate an absence of abuse." *Commonwealth* v. *Quincy Q.*, 434 Mass. 859, 873 (2001), citing *Commonwealth* v. *Federico*, 425 Mass. 844, 851 n.13 (1997). We also note that while the defendant argued below that the judge qualified Dr. Miller without an adequate review of her qualifications, he does not press this claim on appeal.

[11]See *Commonwealth* v. *Swain*, 36 Mass. App. Ct. 433, 444-445 (1994) ("Notwithstanding the theoretical right of a qualified fresh complaint witness also to testify [as an expert] to the general characteristics of sexually abused children, . . . prosecutors would be well advised to avoid such juxtaposition and, if it occurs, trial judges should be alert to its considerable prejudicial potential"). We note that while the potential danger of an expert vouching for a child victim typically has arisen where the expert has been called to speak to general patterns of behavior exhibited by child sex crime victims, similar problems are created when the vouching arises in a different manner. In fact, the Supreme Judicial Court has instructed that, even where an examining doctor does not testify as a complaint witness, testimony "that the symptoms and physical condition of the child were consistent with the type of . . . sexual abuse that the child alleged in this case . . . [comes] impermissibly close to an endorsement of the child's credibility." *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 760 (1995). See *Commonwealth* v. *Calderon*, 65 Mass. App. Ct. 590, 592 (2006) (concluding that examining doctor's "statement that the victim's normal examination was 'consistent with her disclosures' . . . should

an expert's testimony can be construed as impliedly supporting the truthfulness of a victim in sexual abuse prosecutions."[12] Where Dr. Miller had been put before the jury as an expert who had examined "[s]everal thousand" child abuse victims, her conveying that she believed that Becka was telling the truth bolstered Becka's credibility to a degree that cannot be overlooked.[13] We are unable to conclude with confidence that this "did not influence the jury, or had but very slight effect." *Commonwealth v. Flebotte*, 417 Mass. at 353.[14]

Other errors, which were not preserved, were not of great import, but neither were they trivial. For example, the testimony about the Commonwealth's investigatory process (which came in through the mother and the DSS social worker) at least to some extent established "[t]he fact that the Commonwealth

not have been admitted"), citing *Commonwealth v. Trowbridge, supra; Commonwealth v. Allen*, 40 Mass. App. Ct. 458, 466 (1996).

[12]The expert at issue in *McCaffrey* was the treating physician, and we went so far as to urge the Commonwealth in any retrial to use "sexual abuse experts who have no connection with and make no references to the child victim or her family, lest the very real prospect of prejudicial error invalidate the proceeding." 36 Mass. App. Ct. at 593-594. In a subsequent decision, the Supreme Judicial Court, while reversing a defendant's adjudication as a youthful offender on other grounds, found no problem caused by the alleged victim's treating physician serving both as a percipient witness and as the Commonwealth's expert regarding the extent to which sexual assaults necessarily leave signs of physical trauma. *Commonwealth v. Quincy Q.*, 434 Mass. at 872. However, in rejecting the defendant's claim of vouching there, the court emphasized that the physician "did not provide fresh complaint testimony" and "did not comment on the complainant's truthfulness." *Ibid.*

[13]This is not a case where we confidently can state that the testimony was "more important to the defense than the Commonwealth." See *Commonwealth v. McCoy*, 456 Mass. 838, 851 (2010). See also *Commonwealth v. Revells, ante* 492, 499 (2010). For example, to the extent that Becka's testimony opened the door to an argument that she meant to indicate that the person who raped her was someone other than the defendant, Dr. Miller's testimony about her conversation with Becka not only failed to open that door further, but effectively slammed it shut.

[14]In so concluding, we do not in any way mean to impugn Becka's credibility, and we note that the defendant was unable to elicit any reason why she would be lying. But this does not change the fact that it was for the jury to determine whether her testimony was credible, and Dr. Miller's testimony served to undercut that role. "Evaluations of credibility are, of course, within the exclusive province of the trier of fact." *Commonwealth v. Ianello*, 401 Mass. 197, 202 (1987), quoting from *Commonwealth v. Bohannon*, 376 Mass. 90, 94 (1978).

brought its resources to bear on this incident[, which] creates the imprimatur of official belief" in the alleged victim. *Commonwealth* v. *Stuckich*, 450 Mass. at 457 (concluding that testimony about the government's sexual assault victim interview process ordinarily should be excluded because such testimony "is unnecessary and irrelevant to the issue of the defendant's guilt, and is extremely prejudicial"). See *Commonwealth* v. *Monteiro*, 75 Mass. App. Ct. at 493-494.[15] Our conclusion that a new trial is required is reinforced by the volume of the errors present. "Even though not all of the testimony challenged on appeal was the subject of objection at trial, we conclude that appellate relief is warranted based upon the aggregate errors in the case, regardless of the applicable standard of review." *Id.* at 497.

Finally, some comments are appropriate regarding the defendant's contention that the Commonwealth failed to disclose that it intended to call Dr. Miller as an expert witness. The full extent to which the defendant can make out such a claim cannot be determined on the record before us.[16] To the extent that the defendant wanted to rely on this argument, he should have sought to develop the relevant facts in his motion for a new trial. However, regardless of whether any such claim might have provided an independent ground for reversal, we note that

[15]Although the Commonwealth now refers to the testimony about the DSS investigation as "benign background information," the prosecutor highlighted the fact of the investigation in her closing argument: "[The mother] went to DSS, she reported what happened and DSS did their ten-day investigation in conjunction with the police, the Springfield police."

[16]We note that in the colloquy at sidebar, the prosecutor never claimed that she had informed the defendant that the Commonwealth intended to call Dr. Miller as an expert witness (while arguing essentially that the defendant should have realized that this was the capacity in which Dr. Miller was being called). Compare *Commonwealth* v. *Calderon*, 65 Mass. App. Ct. 590, 593 (2006) (concluding that under the facts present there, "the defendant should have known the substance of the [examining] doctor's testimony in advance"). The prosecutor did, however, concede that she never served on the defendant a copy of Dr. Miller's curriculum vitae, while suggesting that she had no duty to do so until the defendant first asked for one. Whatever the precise extent of the Commonwealth's pretrial discovery obligations pursuant to Mass.R.Crim.P. 14(a)(1)(A)(vi), as amended, 444 Mass. 1501 (2005), an issue we do not reach, it is certainly (at a minimum) better practice for the Commonwealth to expressly identify each expert witness it intends to call, and to make such witness's curriculum vitae and other required documentary material available to the defendant without prior request.

our review of the record leaves us with the unmistakable impression that, for whatever reason, defense counsel was unprepared to engage Dr. Miller as an expert witness, despite the fact that her expert testimony went to the heart of one of the defendant's principal defenses.[17] This is one of the considerations that precludes us from concluding that "on the whole record we are satisfied the jury could find their way and the defendant was well defended and fairly tried." *Commonwealth* v. *O'Brien*, 35 Mass. App. 827, 833-834 (1994) (Kaplan, J.) (where "[t]he defense conducted a strong cross-examination of the [child's treating] psychotherapist," no reversible error found as to defense claim that, "to preserve clear lines, the prosecution should have brought in an expert other than one who served as therapist to the child").

In sum, we conclude that the errors require a new trial.[18]

*Judgments reversed.*

*Verdicts set aside.*

---

[17]In his opening, the defendant forcefully highlighted the absence of physical signs of trauma as one of the lead defenses, with specific reference to Dr. Miller's testimony as the examining physician. For reasons that are not entirely clear, the Commonwealth stresses that the defendant switched gears and significantly deemphasized this defense in his closing. While that might have been a wise tactical choice given the strength of Dr. Miller's unrebutted expert testimony, the record reveals that in his closing, the defendant continued to rely on the absence of physical trauma as one of his main defenses.

[18]In view of our disposition, we need not reach the issues raised in the motion for a new trial.