## COMMONWEALTH vs. DANIEL J. LENANE.

No. 09-P-1656.

Plymouth. March 11, 2011. - August 8, 2011.

Present: LENK, GREEN, & KATZMANN, JJ.[1]

*Rape. Evidence,* First complaint. *Practice, Criminal,* Objection, Mistrial, Judicial discretion, Comment by prosecutor.

At a rape trial, no prejudice to the defendant arose from the admission of evidence that exceeded the parameters of allowable first complaint testimony, where the evidence constituted part of the defense strategy to exploit inconsistencies in multiple reports for the purpose of impeaching the victim's credibility. [17-20]

At a criminal trial, the judge did not abuse his discretion in denying the defendant's motion for a mistrial on the ground of a police detective's testimony that she went to a jail to speak with the defendant, where the detective's reference to the defendant's custody status appeared to have been inadvertent, and the most likely inference, if the question in fact occurred to any juror, was that the defendant was in jail in connection with the crime charged in the proceeding at issue. [20-21]

At a rape trial, no error or abuse of discretion arose from the prosecutor's poor choice of words in departing from the terminology contained in the report of an examining physician. [21]

INDICTMENTS found and returned in the Superior Court Department on June 25 and August 12, 2004.

After consolidation, the cases were tried before *Joseph M. Walker, III,* J.

*Jennifer Marie Petersen* for the defendant.

*Gail M. McKenna,* Assistant District Attorney, for the Commonwealth.

GREEN, J. A Superior Court jury concluded that the defendant

[1]This case was argued before Justices Lenk, Green, and Katzmann. Following the appointment of Justice Lenk as an Associate Justice of the Supreme Judicial Court, Justice Carhart was added to the panel and participated in this decision.

raped his then nine year old stepdaughter vaginally and anally and convicted him of multiple charges arising from two separate episodes.[2] The defendant's principal claim of error on appeal is that the victim was permitted to testify about her disclosures to multiple complaint witnesses during the Commonwealth's case-in-chief in violation of the first complaint doctrine.[3] See *Commonwealth* v. *King*, 445 Mass. 217 (2005), cert. denied, 546 U.S. 1216 (2006).[4] Though the Commonwealth presented testimony concerning the victim's multiple reports of the defendant's rapes, the defendant is not entitled to relief because the defendant's disclosed trial strategy was to exploit inconsistencies in these multiple reports for the purpose of impeaching the victim's credibility. Since the defendant accordingly suffered no harm as a result of the evidence of multiple complaints, and discerning no cause for relief in the defendant's other claims of error, we affirm the judgments.

*Background.* We summarize the evidence presented at trial. The victim was born in August, 1993, and first met the defendant when she was seven years old, at the time he began dating her mother. The defendant and the victim's mother began living together and eventually married. The victim initially got along well with the defendant, first calling him "Danny" but eventually calling him "dad" and using his last name as hers at school. In late 2002 and early 2003, the family (consisting of the victim,

---

[2]The first episode occurred in Plymouth County and resulted in the defendant's convictions on charges of rape of a child by force, G. L. c. 265, § 22A, indecent assault and battery of a child under fourteen, G. L. c. 265, § 13B, and threat to commit a crime, G. L. c. 275, § 2. The second episode occurred in Norfolk County and resulted in the defendant's convictions of two charges of rape of a child by force, and assault and battery (a lesser included offense of a charge of assault by means of a dangerous weapon), G. L. c. 265, § 13A.

[3]The defendant also claims that the trial prosecutor made an improper comment during her closing argument and that the trial judge erred in denying his motion for a mistrial after a prosecution witness mentioned his pretrial incarceration.

[4]We note that trial in the present case took place after announcement of the first complaint doctrine in *Commonwealth* v. *King, supra,* but before its refinement in such subsequent cases as *Commonwealth* v. *Murungu,* 450 Mass. 441, 447-448 (2008), *Commonwealth* v. *Stuckich,* 450 Mass. 449, 456-457 (2008), and *Commonwealth* v. *Arana,* 453 Mass. 214, 226-227 (2009). At the time of trial, then, it was not clear precisely how the first complaint doctrine would apply to the testimony at issue in this case.

her mother, the defendant, and the victim's brother) lived in Carver. The victim's mother worked at a Dunkin' Donuts, and the defendant worked for a construction company.

The victim and the defendant occasionally were home together while the victim's mother was at work. On one such occasion, around noon on a weekend in late February, 2003, the living room television was not working, and the victim went to the bedroom shared by her mother and the defendant to watch her favorite program. The defendant was sleeping, clothed, and on top of the bed. The victim sat on the bed, on top of the covers, and watched the program. The defendant woke up, undressed the victim, took off his own clothes, and vaginally raped her. Following the rape, he threatened to kill the victim and her mother if she told anyone about the assault. The victim, still undressed, went to her room. She called her brother, but did not tell him she had been raped.

A few weeks after the rape and after the defendant and the victim's mother both lost their jobs, the family moved to Weymouth. On an occasion during the spring of 2003 when the victim was home alone with the defendant, the victim went into her mother's bedroom and stood in front of the bureau putting on makeup. The defendant came into the room, grabbed the victim's shoulder from behind, pulled her to the bed, undressed her, and, despite resistance from the victim (which included the victim biting his hand), raped her. The defendant first inserted his penis into her vagina, and then turned her onto her stomach and raped her anally. Following the rapes, while holding a knife in his hand, the defendant told the victim not to tell anyone about the incident.

The victim did not report the rapes to anyone until October 2003, when she told her foster sister about what had occurred. By then, the victim's mother had moved out of the defendant's home, leaving the victim behind, and the Department of Children and Families (then known as the Department of Social Services, or DSS) placed the victim in foster care. The victim's foster sister testified at trial as the designated first complaint witness.

Through cross-examination of the victim, the victim's foster sister, Eileen Velez (the victim's social worker), and Detective

Patricia Critch (the Weymouth police detective who investigated the case), the defendant probed a variety of inconsistencies between the victim's trial testimony and the descriptions she had given to others about the two rape episodes. Indeed, the defendant's cross-examination of the victim began with a detailed review of the accounts the victim had given to various third parties concerning the rapes, and that review consumed approximately one-half of the total cross-examination of the victim.[5] From the victim, the defendant elicited testimony that, during an interview by a DSS social worker at her school in May 2003 (and before being placed in foster care), the victim denied having been abused physically or sexually by anyone while living with her mother and the defendant.[6] From the foster sister (and during cross-examination of the victim), the defense elicited testimony that the victim's first complaint described the Carver episode as having included both vaginal and anal rapes and, though alleging that the defendant also subsequently raped her in Weymouth, included no details about the Weymouth rape. From Velez, the defendant elicited testimony that the victim stated to her that the rapes happened after school let out for the summer, in June 2003, and that the two episodes occurred three days apart. From Detective Critch (and during cross-examination of the victim), the defendant elicited testimony that, during the course of her sexual abuse intervention network (SAIN) interview, the victim placed the date of the Weymouth rapes around the time of her brother's birthday, in mid-May, and made no mention of an assault in February.

*Discussion.* 1. *First complaint.* As we have observed, a central defense strategy, revealed during defense counsel's opening statement, was to highlight inconsistencies in the various accounts of the rapes given by the victim in her statements to various other parties. That strategy by its nature required the introduction not only of the fact of multiple reports, but of the details of the various reports.

At trial, after the Commonwealth elicited testimony from the

---

[5]The defendant covered similar ground during a voir dire of the victim, outside the presence of the jury, immediately before trial began.

[6]On redirect, the victim explained that she denied abuse because she did not want to be placed in foster care.

victim concerning her first complaint to her foster sister, the defense raised the objections on which it now relies. After an initial objection that was sustained, there was a general objection to a question that did not, strictly speaking, call for evidence of a complaint by the victim to another party.[7]

The next defense objection was made when the Commonwealth attempted to ask the victim about her failure to report the rapes during her interview by a DSS social worker in May, 2003.[8] Defense counsel requested a sidebar conference, during which defense counsel expressed his concern that the Commonwealth was "trying to cut off the cross-examination before we even get there . . . offering in the case in chief why someone didn't disclose is not substantive evidence."

Thereafter, the victim was allowed (without objection) to answer a question that asked if she spoke to anyone from the Carver police department about what happened (the victim testified "I think so; I'm not sure"), and was allowed (over a general objection) to answer questions asking if she ever spoke to anyone from the Weymouth police department about what happened (the victim testified "I'm not sure"), or if she spoke to anyone when she was at the District Attorney's office about what happened (the victim testified that she told the SAIN interviewer about the rapes). The prosecutor also asked the victim whether she had gone to see a doctor.

The Commonwealth then concluded its direct examination of the victim, and (as we have observed) the defense cross-examination began with a detailed exploration of inconsistencies between the victim's trial testimony and her reports to her

---

[7]The question and objection were as follows:

> Q.: "After speaking to [the foster sister] about what happened, did you then talk to someone else?"

> DEFENSE COUNSEL: "Objection."

[8]The question and objection were as follows:

> Q.: "Prior to telling [the foster sister], were you ever asked by anyone that you're aware of from the Department of Social Services about being touched?"

> DEFENSE COUNSEL: "Objection. Side bar, please."

foster sister, her foster mother, and Velez, and her statements to police and during her SAIN interview.

As a general matter, timely objection at trial is required to preserve a claim of error in the admission of evidence. See *Commonwealth* v. *Perryman*, 55 Mass. App. Ct. 187, 192 (2002). "The purpose of requiring an objection is to afford the trial judge an opportunity to act promptly to remove from the jury's consideration evidence which has no place in the trial." *Abraham* v. *Woburn*, 383 Mass. 724, 726 n.1 (1981). "When objecting, counsel should state the specific ground of the objection unless it is apparent from the context." *Commonwealth* v. *Marshall*, 434 Mass. 358, 365 (2001), quoting from P.J. Liacos, Massachusetts Evidence § 3.8.3, at 85 (7th ed. 1999). The adequacy of an objection to preserve a claim of error must be assessed in the context of the trial as a whole. *Commonwealth* v. *Nardi*, 452 Mass. 379, 395 (2008). If evidence is admissible for any purpose, its admission over a general objection is not error. See *Commonwealth* v. *Errington*, 390 Mass. 875, 882 (1984).

In the case before us, the defense objections to the prosecutor's questions that exceeded the boundaries of admissible first complaint evidence were intermittent and lacking in specificity. None of the defendant's objections cited first complaint as the basis for the objection. Indeed, the Commonwealth contends that the defense objections were inadequate to preserve the claims now pressed by the defendant on appeal. We need not resolve the question, however, because the defendant's claims do not warrant relief even if considered under the more generous standard applied to claims preserved at trial.[9]

We have little difficulty in concluding that the admission of the evidence that exceeded the parameters of allowable first complaint testimony did not prejudice the defendant. Instead, the evidence constituted part of the defense strategy to impeach the victim's credibility. "Where the inconsistencies contained in the cumulative . . . complaint testimony were more important to the defense than the Commonwealth, there is no harm to the

---

[9]In response to a preserved claim of error, "the Commonwealth must show that any error 'did not influence the jury, or had but very slight effect.' " *Commonwealth* v. *Dargon*, 457 Mass. 387, 399 (2010), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

defendant.'' *Commonwealth* v. *McCoy*, 456 Mass. 838, 851 (2010), citing *Commonwealth* v. *Nardi, supra* at 395-396. See *Commonwealth* v. *Mendez*, 77 Mass. App. Ct. 905, 906 (2010); *Commonwealth* v. *Revells*, 78 Mass. App. Ct. 492, 499 (2010).[10] Contrast *Commonwealth* v. *Velazquez*, 78 Mass. App. Ct. 660, 668 n.13 (2011).

2. *Other issues.* We briefly address two other claims raised by the defendant on appeal. First, we discern no abuse of discretion in the denial of the defendant's motion for a mistrial, which he made after Detective Critch testified that she went to the Plymouth County jail to speak to the defendant.[11] Immediately following the detective's statement, the defendant requested a sidebar conference, at which he moved for a mistrial. The judge conducted a voir dire of the witness, during which he questioned Detective Critch about whether the trial prosecutor had warned her against making any reference during her testimony to the defendant's custody status; the detective could not recall. The defendant specifically declined a limiting instruction, requesting instead either that the judge declare a mistrial or exclude any testimony by Detective Critch regarding statements made by the defendant during her interview of him on January 15, 2004. ''The declaration of a mistrial in such circumstances is a decision within the sound discretion of the judge who is in the best position to determine whether the incident is likely to prejudice a jury.'' *Commonwealth* v. *Moran*, 75 Mass. App. Ct. 191, 193 (2009), quoting from *Commonwealth* v. *Morales*, 440 Mass. 536, 548 (2003). We discern no abuse of discretion in the present case; the detective's reference to the defendant's custody status appears to have been inadvertent, and ''the most likely inference, if the question in fact occurred to any juror, was that the

---

[10]While these cases were analyzed under the less exacting standard of a substantial risk of a miscarriage of justice, there is nothing in them that suggests that the result would have been different under a prejudicial error standard. The salient point in the present case is that the defendant purposefully sought to exploit inconsistencies in the victim's various reports of the rapes as a central element of his trial strategy, and that strategy of necessity required the admission in evidence of the multiple complaints themselves.

[11]The question and answer were as follows:

*Q.*: ''And what did you do on January 15th, 2004?

*A.*: ''I went to the Plymouth County jail to speak to the suspect.''

defendant was in jail in connection with the crime charged in this proceeding." *Commonwealth* v. *Billings*, 6 Mass. App. Ct. 884, 885 (1978). See *Commonwealth* v. *Gallagher*, 408 Mass. 510, 517-518 (1990).

We similarly discern no cause to disturb the judgment by reason of the trial prosecutor's use of the words "broken hymen" to refer to a finding contained in the report of an examining physician that the victim's hymen was "not intact." Though the prosecutor employed a poor choice of words in departing from the terminology in the report, the judge administered the standard instruction that arguments are not evidence. Moreover, before using the term "broken hymen" to colloquially describe a hymen that was "not intact," the trial prosecutor read to the jury from the report itself, and the jury had the report with them during their deliberations.

*Judgments affirmed.*